# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KENNETH L. WHITE,**<br>       **Plaintiff,** | **CIVIL ACTION** |
| v. | |
| **CITY OF LANCASTER, PA., et. al.,**<br>       **Defendant.** | **NO. 16-4225** |

## MEMORANDUM OPINION

After drinking a copious amount of hard alcohol, Plaintiff led a slew of officers on a high-speed chase through residential streets, running red lights, hitting multiple vehicles, passing three school buses in broad daylight, before he reversed his car towards officers who were on foot and attempting to corner his vehicle. He admittedly endangered the lives of countless bystanders and pled guilty to charges of reckless endangerment and aggravated assault of several police officers. Now, he asserts that those same officers used excessive force when they shot him in the thigh after he reversed his car towards them and when they tasered him. Defendants have filed a Motion for Summary Judgment. For the reasons below, the Motion will be granted.

   **I.**   **Facts**

After finishing the graveyard shift at work, on the morning of February 11, 2015, Plaintiff Kenneth White took a trip to a local bar around 7 A.M., where he consumed a quantity of hard alcohol he does not recall. He next proceeded to his girlfriend's home sometime later, where he continued to drink. He recalls finishing a bottle of Jose Cuervo tequila at her home. White then proceeded to an auto shop, on foot, to retrieve his girlfriend's car so that he could go to a nearby liquor store. Intoxicated, he drove to the liquor store and bought another bottle of Jose Cuervo. Before White pulled out of the parking lot of the liquor store, he took another swig of tequila from the bottle he had just purchased.

The chase began at approximately 11:31 a.m., when a bystander called 911 to report a suspected drunk driver had driven onto the sidewalk in the 200 block of North Queen Street, Lancaster, Pennsylvania, nearly striking the caller and her friend. Though Plaintiff disputes it, an officer on foot reported that he observed White's vehicle strike another vehicle. Plaintiff recalled that the officer attempted to wave him down. According to a police report, Plaintiff accelerated in the direction of the officer, forcing him to take evasive action to avoid a collision, though Plaintiff disputes this as well.

Several additional officers responded to a call that went out over the police radio. Among them were Defendants, Todd Dickinson and Adam Rommel. Officer Todd Dickinson led the chase as White sped through downtown Lancaster, Pennsylvania, in heavy traffic, passing several pedestrians. Video footage from Officer Dickinson's patrol car shows him proceeding North on North Queen Street and making a left at Lemon Street where an officer on foot directed him towards Plaintiff's fleeing vehicle. The footage shows that Officer Dickinson could see Plaintiff's vehicle one block to the West, at the intersection of Lemon and North Prince. Plaintiff's vehicle had struck a red vehicle from behind at Lemon and North Prince and had come to a brief stop on the opposite side of traffic, in front of a CVS. The video shows the driver of the red vehicle getting out of his car and gesticulating angrily as the officer swerved around him to continue the chase.[1]

The video next shows that Plaintiff's vehicle came to a stop two blocks later as two other police vehicles turned in front of Plaintiff. Plaintiff attempted to reverse when two officers on foot attempted to grab hold of the vehicle. Instead, Plaintiff accelerated through a red light and

---

[1] Plaintiff denies this fact and many others "to the extent that Defendant's characterization is different than what is reflected in the vehicle." Plaintiff's counsel has denied many facts in this manner, needlessly compounding the Court's work to determine the real disputes of material fact. Nevertheless, many of the following facts are taken from the clear evidence provided by the videos irrespective of Plaintiff's counsel's attempts to obscure it.

into oncoming traffic. He successfully evaded two police officers waiting for him one block ahead as the Plaintiff proceeded on Lemon Street. Plaintiff continued to drive at what appears to be a high rate of speed in a 25 mile-per-hour zone through a residential neighborhood. The district attorney's report states that Plaintiff drove at speeds of up to 60 miles per hour in a 25 mile-per-hour zone.[2]

Plaintiff continued to drive west on Lemon Street until it became Buchanan Street, a distance of roughly 10 blocks. He drove through two red lights, a stop sign, and bypassed two waiting police patrol cars over the course of another 4 blocks, until Buchanan ended at a T-intersection. At the intersection, Plaintiff cut off a school bus, and proceeded South on President Avenue, where he ran through a red light in a busy intersection, drove on the opposite side of traffic, and continued for some time on a residential street. Plaintiff came to an extended stop at the intersection of President Avenue and Columbia Avenue, before making an illegal left on Columbia, against another red light.

At this point in the police chase, Plaintiff accelerated toward the downtown area of Lancaster, Pennsylvania, surrounded by dense traffic. Plaintiff's vehicle passed two more school buses, ran an additional red light, and weaved through considerable traffic before his path was blocked. Plaintiff cut across a parking lot and switched back on Manor Street, in the same direction from where he first came. Officer Dickinson continued to pursue Plaintiff at some distance as Plaintiff veered into the opposite lane of traffic on a narrow residential road.

The chase came to an abrupt end when Plaintiff attempted to turn into an alleyway and, for lack of a better word, missed. His car hit a sign and came to rest against a building on the corner of the alleyway. At this point, the video from Officer Dickinson's patrol car showed only a peripheral view of Plaintiff's car because Officer Dickinson used his vehicle to box Plaintiff in.

---

[2] Officer Dommel, who pursued White, broadcast over the radio that he was driving at 60 miles per hour as well.

Officer Dommel, who drove the backup car during the chase, had a better view of the next, more crucial moments. The video from his patrol car shows Plaintiff suddenly reversing his vehicle and striking Officer Dickinson's vehicle.[3] Plaintiff testified he did so in order to "unwedge [his car] from the wall." Video shows Officer Dommel quickly jumped out of the way in order to avoid Plaintiff's vehicle. Two seconds later,[4] while Plaintiff had ceased reversing and began to drive forward, Officer Dickinson fired two shots into the side door of Plaintiff's vehicle, striking Plaintiff's thigh. Plaintiff did not require surgery to treat the gunshot wound to his thigh.

Officer Dommel and Dickinson ordered White to get out of the car and put his hands up. White lifted the bottle of Jose Cuervo in an attempt to throw it out the window, but Officer Dommel told him to put it down. He told Plaintiff to exit the vehicle. When Plaintiff did not comply, Officer Dommel deployed his taser. Two additional police officers opened Plaintiff's driver side door, dragged him out of the car, and put White on the ground. A short time later, Officer Dommel deployed the taser a second time.

Plaintiff brought this two count Complaint alleging that Officers Dickinson and Dommel used excessive force under 42 U.S.C. § 1983 and that Lancaster City and the Police Department are liable for the excessive force violation under Section 1983 as well. Defendants move for

---

[3] Plaintiff's Statement of Undisputed Facts takes issue with Defendant's assertion that the video "shows Mr. White placing his car into reverse, requiring Officer Dommel to take evasive measures to avoid being struck." Plaintiff's response denies this assertion and stated that "[i]t is admitted that the video shows that the vehicle being operated by Plaintiff briefly backed up, stopped, and then moved forward again. The video does not show the interior of the vehicle and thus does not show the act of Plaintiff placing the vehicle into reverse. . . ." Plaintiff testified at his deposition as follows:

    Q: Did you put your car in reverse?
    A: Yes.

[4] A review of the video footage from "Manor-Filbert" shows that Plaintiff crashed his vehicle into the alley at 1:06. Officer Dommel stepped behind Plaintiff's Vehicle at 1:12. Plaintiff began to suddenly reverse at 1:14. He continued to reverse until 1:16. He began to drive forward at 1:17 and the video shows that Officer Dickinson fired the first shot at 1:18, based on the resulting wisp of gunsmoke which appears at that time.

4

Summary Judgment on both claims, asserting that there is no evidence of excessive force under the circumstances, and that the officers are entitled to qualified immunity.

## II. Legal Standard

Summary judgment will be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute exists "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). In ruling on a motion for summary judgment, "[t]he reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). Notably, in instances where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The United States Supreme Court has specifically held that trial courts must "view[] the facts in the light depicted by the videotape" if videotape evidence exists. *Scott v. Harris*, 550 U.S. 372, 381 (2007). In that case, the Supreme Court held that the lower courts erred by crediting the driver's version of events regarding a police chase, even though the driver's version was flatly contradicted by the video. "Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car

chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* Such is precisely the case here.

### III. Discussion

Excessive force claims arising out of an arrest are analyzed under the "reasonableness standard" of the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. A court must judge the reasonableness of particular force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. To prevail on a claim for excessive force, Plaintiff must show that Officer Dommel and Dickinson's use of force against him was objectively unreasonable in light of all of the facts and circumstances confronting them, including the severity of the crime, whether Plaintiff posed an immediate threat to the safety of the officers or others, and whether Plaintiff was actively resisting or attempting to evade arrest. *Id.*

#### A. Use of Deadly Force

Two Supreme Court cases, *Scott v. Harris*, 550 U.S. 372 (2007), and *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014) are dispositive of Defendant's claim. In *Scott*, the Supreme Court held that police officers were justified in using a Precision Intervention Technique maneuver to stop a fleeing vehicle's driver from continuing to evade police. As a result of the maneuver, the vehicle's driver spun out of control, careened down an embankment, and the fleeing driver was rendered quadriplegic from his injuries. After viewing the video footage of the chase, the Supreme Court described the driver's vehicle "racing down narrow, two-lane roads

in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit." *Scott*, 550 U.S. at 379. After weighing the risk the vehicle's driver placed on innocent bystanders and the safety of police officers, the Court found "little difficulty in concluding" that the actions of the police officer were reasonable. *Id.* at 386.

The video footage of Plaintiff's car chase is more harrowing than the chase at issue in *Scott*. Plaintiff's chase took place in a densely-populated residential area in the middle of the day. Plaintiff hit three vehicles, passed three school buses, ran through red lights in busy intersections, almost hit pedestrians, including two police officers, and drove on the opposite side of the road in heavy traffic. He passed dozens of vehicles and several pedestrians during the course of his attempt to evade police. To read Plaintiff's version of events belies the grave danger he imposed on others on the road that day. Indeed, reading Plaintiff's brief, "one gets the impression that [White], rather than fleeing from police was attempting to pass his driving test." *Scott*, 550 U.S. at 378-79. The complete disconnection between fact and reality is best evidenced by the following passage from Plaintiff's brief:

> Plaintiff – who has taken responsibility for his actions – was not driving in a way that imperiled lives such that deadly force was required to stop further theoretical flight after Plaintiff crashed. While Plaintiff does not dispute running red lights and stop signs, the videos show Plaintiff slowing down or stopped at a number of them. Any vehicles Plaintiff struck were not moving and Plaintiff struck them at an extremely low speed.

However, Plaintiff admitted, in his deposition, that he endangered lives by his driving. He also pled guilty to five counts of recklessly endangering another person, two counts of aggravated assault, and three counts of being involved in an accident involving damage to attended vehicle or property. And even though Plaintiff slowed down at some intersections, he ran through many others.

7

Plaintiff's "characterizations" of the video evidence aside, Plaintiff is correct in that the *Scott* Court did not deal with use of deadly force such as a gunshot. The Court acknowledged that there is a difference between action which will impose a likelihood of death and action that would impose a "near *certainty* of death . . . [such as] pulling alongside a fleeing motorist's car and shooting the motorist." *Id.* (citing *Vaughan v. Cox*, 343 F.3d 1323, 1326-27 (11th Cir. 2003)). The Supreme Court dealt with this precise issue – namely discharging a weapon into a fleeing vehicle – several years later, in *Plumhoff*. The Court described a similarly outrageous police chase where the motorist "posed a grave public safety risk." *Plumhoff*, 134 S. Ct. at 2021. The chase terminated when the motorist spun out and collided with a police officer's vehicle. The motorist "threw the car into reverse 'in an attempt to escape.'" *Id.* At that point, the officer fired 15 shots into the motorist's vehicle. The Court considered the risk the motorist's flight imposed on innocent bystanders and held that "it is beyond serious dispute that [the motorist's] flight posed a grave public safety risk, and here, as in *Scott*, the police acted reasonably in using deadly force to end that risk." *Id.* at 2022.

In this case, as in *Plumhoff*, Officer Dickinson was justified in firing his weapon, given what had transpired during the chase, particularly given that Plaintiff was attempting to "unwedge" his vehicle from a wall, a clear attempt to escape, at the precise moment he was shot. If he had managed to flee, his trajectory would have, once again, put innocent bystanders at grave risk. Officer Dickinson's use of force was separately justified because Plaintiff put officers in grave danger when he reversed his car into Officer Dommel, forcing him to take evasive action. *See Stauffer v. Simpkins*, 2015 WL 667012, at *2 (E.D. Pa. 2015). In *Stauffer*, the court held that a fleeing motorist's reckless endangerment conviction established that he recklessly engaged in conduct that placed officers "in danger of death or serious bodily injury"

8

by almost driving over the officers. *Id.* at *3. Without deciding that such a conviction forecloses an excessive force claim in all instances, it is clear from the record here that Plaintiff endangered the life of Officer Dommel by quickly reversing in his direction. Thus, the use of force was reasonable.

Plaintiff makes much of the fact that Officer Dickinson fired his weapon a few seconds after Plaintiff ceased reversing and began to drive forward. In *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), the Third Circuit denied summary judgment for a mall police officer who shot a driver suspected of shop-lifting where the officer testified that she placed herself in front of the driver's vehicle and the driver accelerated towards her. That case is, however, inapposite because there was conflicting evidence about whether the officer was ever in any peril, the facts of that case did not involve a high-speed chase, the driver in that case was suspected of committing only minor offenses as opposed to major crimes, and the court found that there was a genuine issue of fact about whether the driver posed a threat to the public. That is not the situation presented here. *See Thompson v. Howard*, 679 F. App'x 177, 183 (3d Cir. 2017) (distinguishing *Abraham* where the driver of a fleeing vehicle poses a serious threat to public safety unlike a fleeing shoplifter)

The evidence, particularly the extensive video record, is clear: Officer Dickinson's decision to discharge his weapon was objectively reasonable under the circumstances. The video shows that there can be no serious doubt that the officer's actions brought a swift end to a dangerous police chase.

### B. Officer Dommell's Use of Taser

Officer Dommell utilized a taser to subdue Plaintiff on two occasions. In the first instance, Dommell used a taser while Plaintiff sat in his car and failed to comply with police

9

instructions. After Dommell deployed his taser, two officers extracted White from his vehicle and placed him on the ground. In Dommel tased him again while the other two officers were attempting to place White in handcuffs. Each of these instances is considered in turn.

Like an officer's use of a gun, the reasonableness of an officer's use of a taser depends on the facts and circumstances of the situation. *See Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013). In circumstances where an officer pursues a suspect, one of the critical factors to consider is whether the use of the taser put the *fleeing suspect* in imminent danger. *See, e.g. Brown v. Burghart,* 2012 WL 1900603 (E.D. Pa. 2012) (denying officer's motion for summary judgment on excessive force claim where officer used a taser near a flammable liquid and the liquid ignited). An excessive force claim for using a taser is viable where it is apparent that Plaintiff is put at risk of serious injury or death. *See Martin v. City of Reading*, 118 F. Supp. 3d 751, 761 (E.D. Pa. 2015). This is not the case here.

In this case, Officer Dommel first used a taser as White was sitting in his car. Although it is a closer question than the use of deadly force just prior, the circumstances identified in *Graham* demonstrate that the Officer's actions in deploying his taser were reasonable. Those circumstances include the "severity of the crime" (White had just attempted to run over Officer Dommel and led the police on a high-speed pursuit); the "immediate threat" posed by the suspect

(White was not complying with orders to exit his vehicle)[5]; and whether White was "evad[ing] arrest by flight." Although he was not presently in "flight," it is undisputed that Plaintiff's vehicle was not in park and Dommel feared that Plaintiff could have escaped again. *See Graham*, 490 U.S. at 395. The Third Circuit has expanded those factors to consider: (1) whether the suspect is "violent or dangerous;" 2) the "duration" of the force; (3) whether the force was used to make an arrest, 4) the "possibility" that the suspect is armed; and 5) the number of people with whom the police must contend. *Sharrar v. Feilsing*, 128 F.3d 810, 822 (3d Cir. 1997); *Patrick*, 536 Fed. App'x at 258 (applying the *Sharrar* factors to the use of a taser). The first four *Sharrar* factors undeniably demonstrate that the use of force was reasonable under the circumstances.

The second use of Dommel's taser presents a somewhat different situation. By the time Dommel used a taser a second time, White was no longer at a great risk of fleeing because he was outside his vehicle and because other officers were sitting on top of him. *See Sharrar,* 128 F.3d at 822 (considering risk of flight to determine reasonability of use of force). White was also posing less of an "immediate threat" to officers because he was outside of his vehicle. *Id.*

The key question, then, is whether White was resisting arrest when Dommel deployed his taser a second time. In *Brown v. Cwynar*, 484 F. App'x 676 (3d Cir. 2012), the leading Third Circuit case concerning the decision to deploy a taser, the court affirmed a grant of summary

---

[5] Plaintiff alleges that he was complying with orders when he was tased. However, the video shows otherwise. The video shows Officer Dommel commanding Plaintiff to keep his hands up and exit the vehicle. It is undisputed that Plaintiff did not exit the vehicle. Plaintiff argues that his hands were raised, while Defendants assert that his hands were in his lap. The video shows White's hands raised at some points, obscured in others, and on or near the wheel of his vehicle at the moments before Dommel deployed his taser. He admits to trying to throw a bottle of Jose Cuervo out the window while he was receiving commands from Dommel. Even assuming that Plaintiff's hands were raised and he was attempting to comply with commands, Plaintiff admitted that the situation was confusing, that he was receiving multiple commands from multiple officers, and that he "was confused enough not to try to surrender." Even if the use of the first taser were unreasonable, qualified immunity would attach because not every reasonable official in Officer Dommel's position would have understood "beyond debate" that tasering White would constitute excessive force. *See Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011). Moreover, the Third Circuit has upheld the use of tasers where a suspect fails to comply with orders. *See Brown v. Cwynar*, 484 F. Appx. 676 (3d Cir. 2012).

judgment in favor of police officers who deployed a taser multiple times because the plaintiff in that case was tased once and continued to act uncooperatively. Specifically, the Plaintiff in *Brown* was "lying on the ground and refusing to release his hands from beneath his body." *Id.* at 680. Officer Dommel testified that White was not complying with instructions and his left hand was in his waistband, while officers attempted to handcuff him. Plaintiff cannot remember anything about the second taser to respond to this assertion, and the video evidence is obscured. Plaintiff, however, has cited the testimony of four other officers, whom he asserts testified that Plaintiff was not resisting arrest at the time of the second tasing incident. The cited testimony is not helpful. When Plaintiff's counsel asked Officer McCrady whether Plaintiff was resisting, McCrady answered that White was "not following directions." When Plaintiff's counsel asked Officer Balmer whether he noticed Plaintiff struggling with officers, Balmer stated that he was "not responding" and "[b]asically resisting but not violently." Plaintiff's lack of co-operation is, pursuant to *Brown*, supportive of Dommel's use of the taser. When Plaintiff's counsel asked Officer Binderup whether he saw Plaintiff "struggle at all" as he was being extracted from the car by other officers, Binderup answered that he "cannot honestly say that I saw a struggle or anything like that." However, the cited testimony concerned the extraction and not the point in time when Plaintiff was on the ground and Dommel deployed a taser. When Plaintiff's counsel asked Officer Caple whether Plaintiff was resisting arrest, and he answered "no," Officer Caple was referring to the point in time when Plaintiff "was either already in handcuffs or they were being put on him." Thus, neither Officers Binderup nor Caple support Plaintiff's assertion that he was not resisting arrest when officers were attempting to subdue him after the extraction, because the cited testimony describes Plaintiff's actions at other times.

Even construing the facts in the light most favorable to Plaintiff, it is clear that he was resisting commands, whether because he was simply not responding to officers as Officer Balmer stated, or actively resisting as Dommel asserts. Even if Dommel's use of force was unreasonable under the circumstances, he is entitled to qualified immunity. Qualified immunity shields officers from liability unless they violate a "clearly established" constitutional right. *Ashcroft*, 563 U.S. at 735. In *Brown*, the Third Circuit approved an officer's use of a taser to subdue a motorist who refused to comply with orders and continued to struggle with officers. The court held that, in the alternative, the officer in *Brown* was entitled to qualified immunity because a reasonable officer "would not have perceived federal law to preclude deploying a taser" to effectuate an arrest. *Brown*, 484 F. App'x at 681. Like the motorist in *Brown*, officers were actively attempting to subdue White when Officer Dommel deployed his taser.

## C. Claims against City of Lancaster and Lancaster Police Department

Plaintiff also asserts a claim against the City of Lancaster and the Lancaster City Bureau of Police under 42 U.S.C § 1983. He now agrees that his claims against the Lancaster Bureau of Police should be dismissed. *See Debellis v. Kulp*, 166 F. Supp. 2d 255 (E.D. Pa. 2001) (holding that police departments cannot be sued in conjunction with municipalities). The claim against the City of Lancaster can succeed only if it passes muster under the requirements set forth in *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S 658 (1978). Under *Monell*, a Plaintiff must show: (1) the municipality had a policy or custom that deprived the plaintiff of their constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) the plaintiff's injuries were caused by the identified policy or custom. *Id.* at 692-94; *Simpson v. Ferry*, 202 F. Supp.3d 444, 452 (E.D. Pa. 2016). Plaintiff has failed to identify any policy or custom that deprived Plaintiff of his constitutional rights. He merely

asserts that no prior investigation has found a Lancaster Police Officer to have exercised excessive force. Plaintiff is seeking to proceed against the City of Lancaster on a theory of *respondeat superior*, which is specifically prohibited under *Monell*. *See Monell*, 436 U.S. at 694.

**BY THE COURT:**

**/S/Wendy Beetlestone, J.**

**March 6, 2018**                                                  **WENDY BEETLESTONE, J**